**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re   Tracy M. Romigh, | |
| Debtor, | Bankruptcy Case No. 20-20122-TPA |
| Bruce G. Van Vort, Executor of the Estate of Charles G. Van Vort, | Chapter 7 |
| Plaintiff, | Adv. Proc. No. |
| v. | |
| Tracy M. Romigh, | |
| Defendant. | |

**COMPLAINT**

**INTRODUCTORY STATEMENT**

1.    This Complaint is filed by the Plaintiff, Bruce G. Van Vort, Executor of the Estate

of the late Charles G. van Vort, for the purpose of:

(a)    objecting, pursuant to Sections 523 (a)(2)(A), 523 (a)(4), 523(a)(6), and

523(a)(7) of the Bankruptcy Code, to the discharge sought by the Debtor and Defendant,

Tracy M. Romigh ("Romigh"), of the Judgment, in the amount of $199,232.00, imposed

on Romigh by the Beaver County Court of Common Pleas (Orphans' Court Division, Case

No. 1047-16) on or about January 3, 2020 (the "Judgment"); and

(b)      seeking a determination, pursuant to 11 U.S.C. § 523(c), that the Judgment

is not dischargeable pursuant to paragraphs (2), (4), (6), and (7) of subsection (a) of Section

523.

2.      Romigh acted as agent for Charles G. van Vort pursuant to a Power of Attorney

between January 14, 2014 and approximately August 16, 2016; in addition, she was, on or about

September 19, 2013, named a "POA" on the Citizens Bank account owned by Charles G. Van

Vort. (True and correct copies of the *Power of Attorney* (along with the *Acknowledgment by Agent*)

and the Citizens Bank *Updated Fiduciary Signature* are attached hereto as Exhibits "A" and "B,"

respectively.)

3.      During the period of time she served as agent for Charles G. van Vort, Romigh,

upon information and belief, treated Mr. van Vort's funds and other property as essentially her

own by, *inter alia*:

(a)      converting certain of Mr. van Vort's property (primarily his coin collection

and the proceeds from the sale of his vehicle) to her own use without his knowledge or

consent;

(b)      forging Mr. van Vort's signature on numerous checks drawn on his account

for her own benefit;

(c)      using for her own benefit "blank checks" that Mr. van Vort had pre-signed;

(d)      using Mr. van Vort's ATM/debit card and his Chase credit card for

numerous transactions at retail establishments and online merchants for her own benefit;

and

(e)      using Mr. van Vort's ATM/debit card to make over 200 ATM withdrawals (the vast majority of which were for at least $600 at a time), the amount of which totaled more than $100,000, an undetermined portion of which was used for Romigh's benefit.

4.      The Plaintiff therefore hereby objects to the discharge of the Judgment because the funds awarded therein were awarded to compensate the Estate of the Charles G. Van Vort, represented by its Executor, Bruce G. Van Vort, for money that Romigh:

(a) obtained by "false pretenses, a series of false representations, and actual fraud," (§ 523(a)(2)(A));

(b) obtained by "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny," (§ 523(a)(4));

(c) obtained by "willful and malicious injury" upon Charles G. van Vort and his property, (§ 523(a)(6)); and

(d) (if state prosecutors pursue criminal charges against Romigh and a conviction results) may owe as a "fine, penalty, or forfeiture payable to and for the benefit of a government unit," (§523(a)(7)).

5.      The Plaintiff also asks this Court to determine, pursuant to 11 U.S.C. § 523(c), that the Judgment is not dischargeable pursuant to paragraphs (2)(A), (4), (6), and (7) of subsection (a) of Section 523.

## THE PARTIES

6.      The late Charles G. van Vort was a long-time resident of the Commonwealth of Pennsylvania; in August of 2016, he moved to California to live with his son, Bruce G. Van Vort.

7.     Charles G. van Vort was known during his life as "Jerry" and he will be referred to hereinafter as "Jerry," so as to distinguish him from his son, Bruce G. Van Vort, who will be referred to hereinafter as "Bruce" or "the Plaintiff."

8.     Jerry died in California on June 9, 2017.

9.     On or about November 30, 2017, Letters Testamentary were issued by the Superior Court of California, in and for the County of San Luis Obispo, appointing Bruce as the Executor of his father's Estate.

10.    Bruce is a citizen of the State of California, residing at 103 Frances Way, Pismo Beach, CA 93449.

11.    Upon information and belief, Romigh is a citizen of the Commonwealth of Pennsylvania, residing at 102 Waterside Drive, Beaver Falls PA 15010.

## STATEMENT OF JURISDICTION

12.    On or about January 12, 2020, Romigh filed a Petition in this Court seeking relief under Chapter 7 (Case No. 20-20122-TPA); she listed the Judgment on page 3 of Schedule E/F (page 22 of 52 of the Petition).

13.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334.

14.    Because this action is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, this Court also has jurisdiction pursuant to 28 U.S.C. § 1332.

15.    The Plaintiff consents to entry of final orders by the Bankruptcy Judge in this proceeding.

## CLAIMS OF PLAINTIFF

## (ALLEGATIONS APPLICABLE TO ALL CLAIMS)

16.    Jerry was born on February 12, 1926.

17.    Sometime in late 2012 or early 2013, Romigh began helping her mother, Louisa Rees, take care of Jerry in his home in the Town of McCandless; at some point over the course of the ensuing months, Romigh became principally responsible for taking care of Jerry and managing the other women whom she engaged to assist her.

18.    When Romigh was named "power of attorney" on Jerry's Citizen Bank account, on or about September 19, 2013, Jerry was 87 years and 7 months of age.

19.    When Romigh was named agent under the POA of January 14, 2014, Jerry was 87 years and 11 months of age.

20.    According to the medical records for Jerry that the Plaintiff has so far been able to obtain, Jerry's "Problem List" as of January 23, 2014 included: "insomnia," "alcohol use," and "dementia, presenile"; his medications were legion and included oxycodone and oxyContin.

21.    Jerry was later diagnosed with Parkinson's disease and memory loss.

22.    Jerry resided in his own home in Allegheny County until early March of 2015, at which point he was moved to an apartment in Chippewa Township, Beaver County.

23.    At all times relevant hereto, Romigh resided in Beaver County.

24.    Even before she was named agent under the POA, on January 14, 2014, Romigh, upon information and belief, during the approximately 3-month period before the POA came into effect, used Jerry's debit/ATM card to conduct at least 90 transactions and make at least 5 ATM

cash withdrawals, the total amount of which came to $13,587.37. (A complete listing of these transactions appears on the spreadsheet attached hereto as Exhibit "C.")

25.     These transactions include 6 purchases of postage, totaling $150.74, all of which took place in Beaver Falls; none of the amounts of postage purchased in 2013 is divisible by .46 (which was the cost of a first-class stamp in 2013) and neither of the two postage purchases in early January of 2014 is divisible by .49 (the cost of a first-class stamp at that time), suggesting that these were purchases of postage for mailing parcels.

26.     Upon information and belief, Jerry, at the age of 87, had little, if any, need to mail numerous parcels to anyone; rather, the Plaintiff alleges, upon further information and belief, that Romigh was purchasing this postage to pay to mail parcels to her husband's eBay customers or for other purposes of her own.

27.     These ATM/debit-card transactions prior to the January 14, 2014 POA also include, *inter alia*:

(a)     a **$838.63** purchase at Costco;

(b)     a **$228.92** purchase at CNS (believed to be "C & S Sports") in Beaver Falls;

(c)      18 purchases (mostly in Beaver County) at Walmart (or Walmart.com), totaling **$4,113.00** ($122.11, $129.40, $267.02, $177.79, $105.97, $10.48, $283.88, $136.42, $149.15 (in Englewood, FL), $430.70, $263.86, $202.98, $150.89, $581.01, $305.04, $341.85, $327.47, and $126.98);

(d)     4 purchases at Toys R Us, totaling **$839.21** ($251.78, $187.18, $371.84, and $28.41);

(e)    4 purchases at Dunham's, totaling **$926.66** ($609.59, $6.86, $187.97, and $122.24); and

(f)    3 purchases at Justice (a clothing retailer for female "tweens"), the total of which came to **$801.52** ($353.89, $325.00, and $122.63).

28.    Jerry had no minor children; Romigh, however, had three: one boy and two girls, both of whom would, at the time, have been considered "tweens."

29.    Of the 90 pre-POA ATM/debit-card transactions, at least 55 occurred in Beaver County, where Romigh resided, even though Jerry still lived in Allegheny County; three transactions occurred in Florida; three in Erie County; and one (which appears to be a gas purchase) occurred in Crawford County.

30.    A review of Jerry's bank statements back to December 16, 2010 reveals that, prior to the burst of ATM/debit-card spending that begins on or about October 25, 2013 (a little more than one month after Romigh was made the "POA" on Jerry's Citizens Bank account), Jerry's ATM/debit card was *never* used for ATM withdrawals and retail purchases.

31.    In the course of the litigation in the Orphans' Court Division of the Beaver County Court of Common Pleas, Romigh filed two accounts: the first was filed on March 20, 2017 and a Supplemental Account was filed on August 21, 2018.

32.    In the course of the litigation in the Orphans' Court Division of the Beaver County Court of Common Pleas, Romigh also provided sworn deposition testimony on two occasions: the first on August 25, 2017 and the second on December 6, 2018.

33.    Romigh testified under oath that Jerry was a heavy drinker who became intoxicated each evening, and that many times when she arrived at his house the next day she would find him lying on his floor; Romigh's mother testified that Jerry "lived on Oxycontin and alcohol."

34.    Romigh also testified under oath that Jerry had "short-term memory loss."

35.    Romigh testified that she signed both her name and Jerry's name on checks drawn on Jerry's Citizens account.

36.    Although she admitted under oath that she relied on the POA to take various acts regarding Jerry's funds—including, but not limited to, the money in his Citizens Bank account—Romigh later took the position that she never really exercised any powers as Jerry's agent under the POA.

37.    Other witnesses testified that they were paid by checks that had previously been signed (whether by Jerry or by someone else is not clear) in blank; that is to say, the payee and amount of the check were blank.

38.    Over the course of time that the POA was in effect—from January 2014 to August 2016—a total of approximately $567,227.21 of Jerry's money was spent.

39.    Of this total sum, approximately $41,806.69 was for periodic recurring expenses, such as utilities, insurance, and (after March of 2015) rent.

40.    In addition to the periodic recurring expenses, there were non-recurring expenses of approximately $25,680.65 that appear to have been for Jerry's benefit.

41.    The $41,806.69 (for recurring expenses) and $25,680.65 (for apparently legitimate non-recurring expenses) together come to $67,487.34.

42.     When one subtracts $67,487.34 (for recurring and non-recurring expenses together) from the $567,227.21 spent during the period of the POA, one arrives at the figure of $499,739.87.

43.     The United States Department of Labor's Bureau of Labor Statistics ("BLS") publishes annual surveys of consumer spending; according to the survey published for 2015, the average annual expenditure for a person over 75 years of age in the U.S. was $38,123; according to the annual consumer expenditure surveys published for 2014 and 2016, the average annual expenditures for a person approximately 50 years of age (the surveys for 2014 and 2016 appear not to contain figures for people in their mid-70s) were $53,495 and $57,311, respectively.

44.     Adding together the BLS figures for 2014, 2015, and 2016 (even though the numbers for middle-aged persons provided for 2014 and 2016 are likely much higher than one would expect for persons in their mid-70s), one arrives at a total of $148,929.

45.     Using the BLS figures while also taking account of the recurring and non-recurring expenses (¶¶ 39-42) involves significant duplication—in Romigh's favor—since the BLS figures include expenses (such as for rent and utilities) that were already taken into consideration in the subtraction of recurring and non-recurring expenses.

46.     Nevertheless, subtracting the sum of $148,929 (to reflect living expenses based on the BLS surveys) from the $499,739.87 arrived at above, in Paragraph 42, yields $350,810.87 in unexplained spending from Jerry's account during the period of time covered by the POA.

47.     During the time covered by the POA, Jerry was being watched by Romigh and her mother along with a number of women Romigh engaged to assist with Jerry's care; five of these women were paid mostly by check and the total they received was approximately $133,595; Romigh

testified that she was paid both by check and by cash; the total Romigh was paid for actually

watching Jerry, however, is not clear, but it was likely at least $33,525.11 (although this sum

includes payments on 32 checks forged by Romigh (payable either to Romigh or to "cash" but

actually cashed by Romigh); 11 of these forged checks covered periods of time written on the memo

lines of each check but each check had been cashed and cleared before the end of the time

specified); one caregiver, Deborah Anderson, was paid only by cash and the amount that went to

her is not known.

48.    The funds actually paid to Romigh and the other caregivers for spending time with

Jerry thus cannot be fixed at more than approximately $167,120.

49.    Even if one were to stipulate to payments totaling $200,000 to caregivers (including

Romigh and Deborah Anderson) during the time covered by the POA, when this amount is

subtracted from the $350,810.87 figure arrived at in Paragraph 46, this leaves $150,810.87 in

unexplained spending from Jerry's Citizens Bank account between mid-January of 2014 and mid-

August of 2016.

50.    The analysis set forth in the foregoing Paragraphs 38-49 may be summarized as

follows:

| | | | |
|---|---|---|---|
| (a) | | $567,227.21 | • in total spending from 1/14/14 to 8/16/16; |
| (b) | less: | ($41,806.69) | • for recurring expenses; |
| (c) | | ($25,680.65) | • for apparently legitimate non-recurring expenses; |
| (d) | | ($148,929) | • to reflect living expenses per the BLS surveys (although many of these expenses have already been included in the recurring and non-recurring expenses); and |

(e)         ($200,000)      • to reflect a combination of actual and estimated payments to caregivers;

(f) yields $150,810.87 in spending from Jerry's Citizens Bank account during the period covered by the POA that remains to be explained according to the previous calculations.

51.     The discrepancy between the figure in the immediately preceding Paragraph and the amount of the Judgment is due to (1) the duplication of living expenses pointed out in Paragraph 45 and (2) amounts attributable to the conversion of Jerry's coins and the proceeds from the sale of Jerry's car (*see* ¶¶ 75-89, *infra*), which were included in the Judgment.

52.     Romigh, upon information and belief, used Jerry's Citizens debit card and Jerry's Chase credit card to make purchases from numerous retailers during the entire period of time covered by the POA, including, but not limited to: approximately $39,112.78 at Walmart, approximately $6,727.09 at Costco, approximately $1,576.61 at Justice (again, a clothing store for "tween" girls), and $900.44 at Victoria's Secret and Venus (both of which specialize in lingerie and women's swimsuits).

53.     The following reflects a portion of the funds spent over the course of the 29 months covered by the POA, broken down into various categories based on the type of expense and the vendor:

(a) expenditures on food……………………………………$35,741.53

        (i) dining out ($21,313.17)

        (ii) groceries ($14,428.36)

(b) expenditures at general retailers ………………………… $42,936.19

   (i) Walmart ($34,949.68)

   (ii) Costco ($5,617.66)

   (iii) Target ($1,386.69)

   (iv) K-Mart ($767.65)

   (v) Dollar General ($213.51)

(c) expenditures at gas stations (Jerry did not drive)………..$8,153.48

(c) expenditures for auto parts and repairs

   (Jerry had no car after February 5, 2014)…………..$1,627.82

(d) expenditures on home supply and décor………………$5,763.81

   (i) Home Depot ($3,383.89)

   (ii) Home Goods ($171.66)

   (iii) Ace Hardware ($188.76)

   (iv) IKEA ($235.11)

   (v) Lowe's ($645.93)

   (vi) At Home ($302.03)

   (vii) Tractor Supply ($836.43)

(e) expenditures at shoe stores and sporting goods stores….$4,161.57

   (i) Dunhams ($820.12)

   (ii) Dick's ($2,751.56)

   (iii) Footlocker ($424.99)

   (iv) Payless Shoes ($94.95)

   (v) Famous Footwear ($29.99)

(vi) At Home (39.96)

- all of which together comes to a total of $98,384.40.

54.    A large number of the debit and credit card purchases made during the period of time that the POA was in effect were described in Romigh's accounts variously as "gifts" or "gifts"/"payments," not just to Romigh herself, but also to unidentified "girls," to unnamed caregivers, and to the unidentified children of unnamed caregivers. (A complete listing of these transactions, along with debit purchases of postage during the POA, all of which totals $22,081.93, appears on the spreadsheet attached hereto as Exhibit "D.")

55.    Upon information and belief, virtually none of the purchases identified in Romigh's accounts, in whole or in part, as "gifts" were actually gifts given by, or authorized by, Jerry.

56.    Upon information and belief, none of the purchases identified in Romigh's accounts, in whole or in part, as "payments" were, in fact, payments for care actually provided to Jerry, as Romigh herself admitted that she did not keep records of the time she and the other caregivers spent with Jerry.

57.    Upon information and belief, virtually all of the references to "girls" or "caregivers" as recipients of "gifts" or "gifts"/"payments" refer, in fact, to Romigh herself.

58.    In addition to the debit and credit card purchases discussed in the foregoing Paragraphs 51 -56, there were a total of 196 ATM withdrawals from Jerry's Citizens account during the 29 months covered by the POA, the vast majority of which were for amounts of $600 or more; the total amount removed from Jerry's account in these ATM withdrawals comes to $106,043.45.

59.    In Romigh's accounts, these ATM withdrawals are described either as a "Withdrawal - Payment Debbie/Partial Pay Tracy/Jerry's cash on hand" (in the first Account) or as a "Withdrawal of cash for Jerry (he liked to have cash on him)" (in the Supplemental Account).

60.    As already mentioned, Romigh herself testified that she did not maintain records of time that she and the other caregivers spent with Jerry; she also testified that Jerry might have had a "few hundred" dollars at any one time (while other witnesses testified he kept far less cash on him); thus, upon information and belief, the claims in Romigh's two accounts that the ATM withdrawals from Jerry's Citizens Bank account constituted either "cash for Jerry" or payments to herself and another caregiver are false.

### For a First Claim Against the Defendant

**(Objection to Discharge of Judgment representing a debt for money obtained by "false pretenses, a false representation, or actual fraud" pursuant to 11 U.S.C. § 523(a)(2)(A))**

61.    The Plaintiff hereby incorporates by reference the foregoing Paragraphs 1-60 as if set forth herein verbatim.

62.    When she signed the "Acknowledgment by Agent" at the time the POA was executed on or about January 14, 2014, Romigh, upon information and belief, stated that she would *inter alia*:

(a)    exercise her powers as agent for Jerry's benefit;

(b)    keep Jerry's assets separate from her assets; and

(c)    keep a full and accurate record of all actions, receipts and disbursements on Jerry's behalf.

63.    At the time she made these representations, Romigh, upon information and belief, had already been treating Jerry's funds as her own, having spent approximately $13,587.37 of Jerry's money on herself over the course of the preceding three months.

64.    In addition, for four months prior to becoming agent under the POA and making the statements set forth in Paragraph 61, Romigh had been the "POA" on Jerry's Citizens Bank account, which position, upon information and belief, she almost immediately began to abuse in the manner that has already been described (*see* ¶¶ 24-30, *supra*).

65.    Based on Romigh's conduct during the 3-4 months preceding the execution of the POA in January of 2014, the Plaintiff alleges, on information and belief, that Romigh's representations that she would:

(a)    exercise her powers as agent for Jerry's benefit;

(b)    keep Jerry's assets separate from her assets; and

(c)    keep a full and accurate record of all actions, receipts and disbursements on Jerry's behalf

were false when she made them

66.    Upon information and belief, the Plaintiff alleges that Romigh made the foregoing false representations either with knowledge that they were false or with reckless disregard as to whether they were true or false.

67.    Upon information and belief, the Plaintiff alleges that these false representations were material in the context of Jerry's decision to appoint Romigh as his agent under the POA.

68.    Upon information and belief, the Plaintiff alleges that Romigh made the foregoing false representations with the intent of misleading Jerry into relying on them.

69.    Upon information and belief, Jerry did in fact rely on the foregoing false representations.

70.    Given all the circumstances at the time, including, upon information and belief, Jerry's advanced age, his mental and physical condition, and the feelings of trust and confidence that Romigh had cultivated in Jerry during the time she and her mother had been watching him, Jerry's reliance on Romigh's false representations was justifiable.

71.    Upon information and belief, the Plaintiff alleges that, in fact, Romigh, during the time that the POA was in effect, did not:

    (a)    exercise her powers as agent for Jerry's benefit;

    (b)    keep Jerry's assets separate from her assets; and

    (c)    keep a full and accurate record of all actions, receipts and disbursements on Jerry's behalf

72.    The losses of funds Jerry sustained during his life, which losses are now borne by his Estate and are reflected in part by the Judgment against Romigh entered by the Beaver County Court of Common Pleas, were proximately caused by Jerry's justifiable reliance on Romigh's false representations.

WHEREFORE, the Plaintiff objects to any discharge of the Judgment as it represents, in whole or in part, a debt for money obtained by "false pretenses, a false representation, or actual fraud" pursuant to 11 U.S.C. § 523(a)(2)(A).

### For a Second Claim Against the Defendant

**(Objection to Discharge of Judgment representing a debt for, or for money obtained by, "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny"pursuant to 11 U.S.C. § 523(a)(4))**

73.     The Plaintiff hereby incorporates by reference the foregoing Paragraphs 1-72 as if set forth herein verbatim.

74.     Upon information and belief, Romigh, both as "POA" on the Citizens Bank account and as agent for the POA executed on or about January 14, 2014, had a fiduciary duty to Jerry.

75.     Upon information and belief, Romigh breached her fiduciary duties to Jerry by spending, as already described, many thousands of dollars of Jerry's money from his Citizens Bank account as if it were her money; in addition, Romigh engaged in fraud, defalcation, embezzlement, and larceny by: stealing Jerry's coins and giving them to her husband to sell on eBay (while charging the postage to Jerry); selling Jerry's car and keeping the proceeds; forging Jerry's signature on 53 checks (in a total amount of $78,569.30) for her direct benefit.

### Jerry's Coins

76.     Upon information and belief, Jerry was a coin collector.

77.     In addition to the fraud and breaches of fiduciary duty already described, Romigh, upon information and belief, took a large, albeit undetermined, number of coins belonging to Jerry, without Jerry's knowledge or consent, and gave them to her husband at the time, Harry Romigh, on more than one occasion.

78.     Harry Romigh, upon information and belief, sold these coins on eBay for a total amount of approximately $9,261.23.

79.     Upon information and belief, Romigh assisted her husband with his eBay sales by taking parcels of coins and other items Mr. Romigh had sold to the post office and mailing them to Mr. Romigh's eBay customers.

80.     In addition to the six purchases of postage using Jerry's Citizens Bank debit card prior to the January POA (see ¶ 25), Romigh, upon information and belief, made an additional 38 purchases of postage using Jerry's Citizens Bank debit card during the time the POA was in effect; all but two of these purchases were for amounts that are not evenly divisible by .49 (the cost of a first-class stamp during the relevant period).

81.     Upon information and belief, Romigh used Jerry's Citizens Bank debit card to purchase postage to mail parcels to her husband's eBay customers, including, but not limited to, customers who had purchased the coins she had taken from Jerry and given to her husband.

### Jerry's Car

82.     Upon information and belief, Jerry, up until February 5, 2014, owned a vehicle, though he had not driven it for many years.

83.     Sometime in early February of 2014, Romigh, upon information and belief, either secured Jerry's signature to a document transferring the title of his vehicle to her, or forged his signature on such a document.

84.     In addition, and further on information and belief, Romigh, on or about February 5, 2014, forged Jerry's signature to Check No. 596, in the amount of $22.50, payable to the "Commonwealth of PA" to cover the fee to transfer to Romigh the title to Jerry's car.

85.     Shortly after the title to the vehicle was transferred from Jerry to Romigh, it was, upon information and belief, sold to one of Romigh's neighbors in Beaver County for approximately $16,000.

86.     In her Supplemental Account, Romigh described Check No. 596 as a "gift" to her from Jerry.

87.     In her two depositions, Romigh gave inconsistent testimony regarding Jerry's car; while she testified that Jerry had given the car to her as a "gift," she also testified that she gave back to Jerry some or all of the proceeds from the sale of the car.

88.     Upon information and belief, no such return of funds is reflected in any deposit into Jerry's Citizens Bank account.

89.     Upon further information and belief, Romigh never returned any of these funds to Jerry; instead, she put the proceeds from the sale of Jerry's car into a safe in her house; her ex-husband, Harry Romigh, has stated (subject to criminal penalties for making false statements) that he removed those funds (approximately $1,000 of which had already been spent) on or about the time that he left the marital residence in or around early April of 2016; Mr. Romigh, moreover, has confirmed that Romigh was aware that he had taken the funds because they had argued about it.

## Forgeries of Jerry's Checks

90.     In addition, Romigh forged Jerry's signature on numerous checks throughout the period of time that the POA was in effect.

91.     Fifty-three (53) of these forged checks were made out

    (a)     to Romigh;

    (b)     to "cash" (and then cashed by Romigh); or

(c)      to third parties (including a $15,000 check to Romigh's paramour at the time, one Scott Mix) and for Romigh's own benefit (*e.g.*, a $100 check to the bank holding the mortgage on her house and $4,200 (comprising checks in the amounts of $1,500, $1,200, and $1,500) as down payments for one or more of her vacations) or for the benefit of her children (*e.g.*, $550 to the "Faith Ranch Horsecamp" for Romigh's two daughters).

92.      A list of the forged checks that benefitted Romigh herself, her paramour, or her children is set forth on the spreadsheet attached hereto as Exhibit "E."

WHEREFORE, the Plaintiff objects to any discharge of the Judgment as it represents, in whole or in part, a debt for, or for money obtained by, "false pretenses, a false representation, or actual fraud" pursuant to 11 U.S.C. § 523(a)(4).

### For a Third Claim Against the Defendant

**(Objection to Discharge of Judgment representing a debt for, or for money obtained by, "willful and malicious injury by the debtor" to Charles G. van Vort and his property, pursuant to 11 U.S.C. § 523(a)(6))**

93.      The Plaintiff hereby incorporates by reference the foregoing Paragraphs 1-92 as if set forth herein verbatim.

94.      Upon information and belief, the instances of theft, conversion, fraud, forgery, and breach of fiduciary duty already described are sufficient to constitute "willful and malicious injury" by Romigh to Charles G. van Vort and to his Estate.

WHEREFORE, the Plaintiff objects to any discharge of the Judgment as it represents, in whole or in part, a debt for, or for money obtained by, "willful and malicious injury" by Romigh to Charles G. van Vort and his Estate, pursuant to 11 U.S.C. § 523(a)(6).

## For a Fourth Claim Against the Defendant

### (Objection to Discharge of Judgment representing a debt that may be imposed as restitution in the context of possible criminal proceedings, pursuant to 11 U.S.C. § 523(a)(7))

95.     The Plaintiff hereby incorporates by reference the foregoing Paragraphs 1-94 as if set forth herein verbatim.

96.     The Plaintiff is preparing a private criminal complaint based on the conduct described in this pleading.

97.     The Plaintiff intends to submit this private criminal complaint to state prosecutors in both Allegheny County and Beaver County.

98.     In the event prosecutors in either or both offices institute criminal proceedings against Romigh for the conduct described herein, and a conviction results, the Judgment will represent a debt covered, in whole or in part, by any order to make restitution.

WHEREFORE, the Plaintiff objects to any discharge of the Judgment as it represents, in whole or in part, a debt that may be imposed as restitution in the context of possible criminal proceedings, pursuant to 11 U.S.C. § 523(a)(7).

## For a Fifth Claim Against the Defendant

### (Request for Determination that the Judgment Should Be Excepted from Discharge as Debts Specified in Paragraphs (2), (4), (6) and (7) of subsection (a) of Section 523 of the Bankruptcy Code, pursuant to 11 U.S.C. § 523(c))

99.     The Plaintiff hereby incorporates by reference the foregoing Paragraphs 1-98 as if set forth herein verbatim.

100.    Based on the allegations in the foregoing Paragraphs 1-98, the Plaintiff requests a determination from this Court that the Judgment imposed on Romigh by the Court of Common

Pleas should be excepted from discharge as debts specified in paragraphs (2), (4), (6) and (7) of subsection (a) of Section 523 of the Bankruptcy Code.

WHEREFORE, the Plaintiff requests that this Court issue a determination that the Judgment shall be excepted from any discharge granted to Romigh, pursuant to 11 U.S.C. § 523(c).

## **FINAL PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff objects:

• to any discharge of the Judgment as it represents, in whole or in part, a debt for money obtained by "false pretenses, a false representation, or actual fraud" pursuant to 11 U.S.C. § 523(a)(2)(A);

• to any discharge of the Judgment as it represents, in whole or in part, a debt for, or for money obtained by, "false pretenses, a false representation, or actual fraud" pursuant to 11 U.S.C. § 523(a)(4);

• to any discharge of the Judgment as it represents, in whole or in part, a debt for, or for money obtained by, "willful and malicious injury" by Romigh to Charles G. van Vort and his Estate, pursuant to 11 U.S.C. § 523(a)(6).

• to any discharge of the Judgment as it represents, in whole or in part, a debt that may be imposed as restitution in the context of possible criminal proceedings, pursuant to 11 U.S.C. § 523(a)(7); and

the Plaintiff requests that this Court issue a determination that the Judgment shall be excepted from any discharge granted to Romigh, pursuant to 11 U.S.C. § 523(c), as debts specified in paragraphs (2), (4), and (6) of subsection (a) of Section 523 of the Bankruptcy Code.

Respectfully submitted,


    s/C. Shawn Dryer
C. Shawn Dryer
PA ID No. 81741
640 Fourth Street
Beaver, Pennsylvania 15009
Telephone: 412-389-2999
Facsimile: 724-397-3111
dryerlawoffice@gmail.com

**COUNSEL FOR PLAINTIFF BRUCE G. VAN VORT, EXECUTOR OF THE ESTATE OF CHARLES G. VAN VORT**